## THE PEOPLE OF THE STATE OF ILLINOIS

*v.*

## JOHN T. STUART *et al.*

*Filed at Springfield November 26, 1880.*

1. CONTRACT—*construction of a bond given to provide or pay for additional State House grounds—of the conditions to fix a liability.* The act of the General Assembly of this State, approved June 14, 1871, making a further appropriation for the construction of the new State House, provided that no part of that appropriation should be paid out of the State Treasury until there should have been filed with the Secretary of State a good and sufficient bond of individuals, in favor of the People of the State, in the penal sum of $500,000, conditioned that the obligors would procure, or cause to be obtained for the State, such additional grounds as the State might indicate and require, whenever so demanded, not exceeding four acres adjoining the new capitol grounds, free of cost to the State, or in case said grounds could not be furnished by said individuals, or they should refuse to do so, then the State might proceed to condemn such grounds as it might require for the purpose of enlarging said capitol grounds, the amount assessed for the same under such condemnation should be paid by the obligors of said bond.. In pursuance of this act a bond was executed by certain individuals, in the prescribed penalty, and reciting the act, conditioned as follows: "Now, if the subscribers hereto shall well and truly do and perform the conditions and requirements set forth and specified to be done and performed by the obligors of the bond in said act referred to, then this obligation shall be null and void, otherwise it shall remain in full force and effect." Under a proper construction of this bond the State was absolutely bound to do nothing. It might or might not,

Syllabus.

on the failure of the obligors to furnish the grounds in question, proceed to condemn the same, as in its wisdom seemed best. So that, before any right of action could accrue upon the bond, the State was bound to institute, and prosecute to a successful termination, such condemnation proceedings as would, upon the payment of the condemnation money, vest the title to these grounds in the State, and for this purpose the State impliedly undertook to provide all such agencies, including appropriate legislation, as would be necessary to accomplish the end proposed. The sole consideration of the bond being the acquiring of the title to the grounds by the State for State House purposes, the obligors could not be required to pay for the grounds before the State should acquire the title thereto. Or, the utmost that could be claimed as fixing the liability of the obligors, would be that the State, in accepting the bond from the persons executing the same, impliedly stipulated that, in the event of condemnation proceedings, it would so shape its legislation, and the proceedings under it, that the payment of the condemnation money and the acquiring of the title by the State would be concurrent acts.

2. Taking the bond in connection with the act of 1871, in pursuance of which it was executed, it provides that the "amount assessed" for the proposed additional State House grounds, in condemnation proceedings to be provided for the purpose, shall be paid by the obligors. The bond is silent as to the person or persons to whom they shall make such payment, but the implication is, they undertook to pay the owners of the condemned lands according to their respective interests. And in order to fix the liability of the obligors and give a right of action on the bond, it is essential the State should, in the event of instituting condemnation proceedings, provide such appropriate legislation for that purpose as would authorize and require the obligors, as a part of the condemnation proceedings, to make such payment, and generally so shape its legislation and conduct the proceedings that the State, upon such payment, would acquire a good title to the lands in question.

3. SAME—*effect of the act of May 21, 1877, in providing the mode of making payment of the condemnation money, as affecting the question of liability on the bond.* The act of May 21, 1877, prescribing the mode of condemnation of these grounds, provided that upon filing in the office of the Auditor of Public Accounts a certified copy of the report of the commissioners who were to ascertain and determine the amount of condemnation money to be paid to the owners, the Auditor should draw his warrant upon the State Treasurer in favor of such owners, and that the Treasurer, upon presentation of the warrants by the owners should pay them; and the Attorney General was required by the act to institute suit upon the bond given as mentioned, in case the obligors therein should not, within thirty days after the filing of the commissioners' report, pay to the Treasurer of the State "the total sum so reported by said commissioners as compensation for the lands," etc. The act, in thus appointing the mode of making payment of the condemnation money to the

owners of the lands, excluded all other modes of payment. The owners could not be compelled to accept payment in any manner other than that provided by law. The obligors in the bond were not permitted to make payment to the owners, because the act directed them to make payment to the State Treasurer. By the failure of the Auditor to issue his warrants on the Treasurer within the thirty days after the expiration of which the obligors in the bond were required to reimburse the State Treasury in the amounts provided to be paid to the owners, the obligors might well be justified in concluding the State, as it had a right to do, had abandoned the matter altogether. The payment required by the act to be made by the obligors to the State Treasurer being regarded as a mere indemnity to the State, or reimbursement for moneys advanced by the State under the condemnation proceedings, there could be no right of action on the bond unless there was an actual payment of the condemnation money by the State.

4.  SAME—*want of power in the legislature to provide the means of payment for these grounds—constitutional limit of appropriations for State House purposes.* The act of 1877 providing for the condemnation proceedings, and for the mode of payment thereunder, directed the State Treasurer to pay the warrants which the Auditor might issue under the act, "out of any moneys in said treasury appropriated for State House purposes." At the time of the commencement of these condemnation proceedings there was no money in the State Treasury which could properly be applied to the payment of those warrants, and prior to that time the appropriations made on account of the new capitol grounds and the construction and furnishing of the new State House had reached the constitutional limitation of $3,500,000, so that there could be no fund out of which this condemnation money could be paid until provided by a vote of the People of the State for a further appropriation for State House purposes. A liability upon this bond, as arising upon proceedings had under this act of 1877, can not be predicated upon such a contingency, which may never happen.

5.  The limitation in the constitution in respect of the amount which might be appropriated for grounds connected with the new State House, and for erecting the building, etc., is not restricted to such grounds as the State had, at the time of the adoption of the constitution, acquired for the purposes of the new capitol, but extends to all grounds belonging to the capitol, without regard to the time when they may be purchased.

6.  Should the obligors in this bond pay the condemnation money into the State Treasury it would become a part of the general State fund, and even this money could not be paid to the owners of the lands, as there has been no appropriation of it by the legislature for that purpose, and the power of the legislature in that regard having been exhausted, no such appropriation can be made. But even if the power existed to appropriate this particular fund to the payment of the owners of the lands, the act of 1877 does not undertake to do so, but provides another and very different mode of payment. So that,

in any view, there is no means provided by existing legislation, and can not be under the present powers of the legislature, to make payment to the owners in the mode prescribed by the act of 1877, and a payment in that mode is a precedent condition to. any present liability on this bond.

7.  EMINENT DOMAIN—*whether a jury is required on assessment of damages in condemnation proceedings.* The present constitution requires that in all condemnation proceedings, except in cases where the compensation is to be paid by the State, the assessment shall be by jury. In considering the effect of the bond in question, the State has no interest in the matter of the amount of the compensation to be paid,—that is a question purely between the owners of the lands and the obligors in the bond, as, under any proper legislation, the compensation is to be paid, if at all, by these obligors. So the parties in interest in these proceedings had a right to have the amount of compensation determined by a jury. Per DICKEY, C. J., and WALKER, J.

8.  JUDICIAL NOTICE—*as to existing appropriations, and the power to make them.* As under the constitution all appropriations by the General Assembly can only be made by public law, this court will take judicial notice of the fact that at the time of the commencement of these condemnation proceedings the General Assembly had already, by previous appropriations on account of the new capitol grounds and construction and furnishing of the State House, exhausted its power,—and also of the fact that there was no money in the State Treasury which could legally be applied to that purpose.

APPEAL from the Circuit Court of Sangamon county; the Hon. W. R. WELCH, Judge, presiding.

This was an action of debt, commenced in the Sangamon circuit court on the 26th of September, 1878, on a penal bond executed by the defendants and certain other citizens of Sangamon county, since deceased, on the 8th day of August, 1871, in the sum of $500,000, conditioned that the obligors would, upon demand, either procure for the State, free of cost, such additional capitol grounds as the State might indicate, not to exceed four acres, to the south of and adjoining the new capitol grounds, or, in case they could not be furnished or they should fail or refuse to furnish them, they would, upon the condemnation of them by the State, pay the amount assessed for the same under the condemnation proceedings.

The charging part of the declaration is as follows:

" For that whereas, heretofore, to-wit, on the eighth day of August, A. D. 1871, at the city of Springfield, in the county of Sangamon, aforesaid, the said defendants, together with O. H. McKinstry, C. M. Morrison, Noah W. Matheny, H. G. Fitzhugh, William A. Turney, J. W. Smith, Seth B. Brock, E. U. London, R. A. Connelly, John C. Ragland, Samuel B. Fisher, Joel Johnson, Henry C. Barrell, Thomas J. Tuite, John F. Pritchard, Patricius Moran, John Armstrong, James Gourley, John P. Tipton, G. B. Sommer, Russell Churchill, Jesse K. Dubois, David Sherman and James L. Lamb, deceased, made, executed and delivered to the People of the State of Illinois, the plaintiffs aforesaid, their certain writing obligatory, sealed with their seals, and now to the court here shown, and which said writing obligatory, with the conditions thereunder written, signed and executed by the said defendants, (together with the said deceased obligors,) by the names, initials and abbreviations, as hereinafter stated, is in the words and figures following, to-wit:

" ' *Know all men by these presents:*

" ' That we, the subscribers hereto, are held and firmly bound to the People of the State of Illinois, in the penal sum of $500,000 in lawful money of the United States, for the payment of which, well and truly to be made, we bind ourselves, our heirs, executors and administrators, jointly and severally.

" ' In testimony whereof we have hereunto set our hands and seals this —— day of ——, A. D. 1871.

" ' The condition of the foregoing obligation is such that, whereas, by the second section of an act of the General Assembly of the State of Illinois, entitled 'An act to make further appropriation for the construction of the new State House,' approved June 14, 1871, it was provided in substance and to the effect as follows:

" ' SECTION 2. That for the purpose of carrying on the work of the new State House, the sum of $600,000 be and the same is hereby appropriated out of any moneys in the

treasury not otherwise appropriated, in addition to the unexpended balance of former appropriations made for the new State House, which sum is hereby re-appropriated for that purpose : *Provided,* that no part of this appropriation shall be paid out of the State Treasury until there shall have been filed with the Secretary of State a good and sufficient bond of individuals, in favor of the People of the State of Illinois, in the penal sum of five hundred thousand dollars ($500,000,) to be approved by the Governor of the State of Illinois, conditioned that the obligors will procure or cause to be obtained for the State of Illinois, such additional grounds as the State may indicate and require whenever so demanded, not exceeding four acres to the south of and adjoining the new capitol grounds, free of cost to the State, or in case said grounds can not be furnished by said individuals, or they should refuse to do so, then the State may proceed to condemn such grounds as it may require for the purpose of enlarging said capitol grounds, the amount assessed for the same under such condemnation shall be paid by the obligors of said bond. The demand by the State for such additional grounds, and the condemnation, if necessary, shall be made within two years after the new State House is ready for the use of the two houses of the General Assembly, and which land so to be condemned or procured is to be not less than the quantity of land described in a certain bond filed with the Secretary of State at the last session of the twenty-seventh General Assembly, and which bond is dated on the 4th day of April, 1871. Now, if the subscribers hereto shall well and truly do and perform the conditions and requirements set forth and specified to be done and performed by the obligors of the bond in said act referred to, then this obligation shall be null and void. Otherwise it shall remain in full force and effect.

[Here follow the signatures and seals of the defendants and deceased obligors.]

"And which said bond was so made and executed by the said defendants, and then and there presented to the Hon. John M. Palmer, then Governor of the State of Illinois, for approval, as the bond required to be given under and in pursuance of the provisions of said act in the condition of said bond recited, and was by the said Governor then and there approved by indorsement thereon in words and figures following, to-wit:

'Security approved August 8, 1871

(Signed,)                                   JOHN M. PALMER.'

"And was then and there, to-wit, on the 8th day of August, A. D. 1871, filed in the office of the Secretary of State of the State of Illinois, as by the provisions of said act required; and thereupon the several appropriations in said act in the condition of said bond recited, were from time to time drawn from the treasury of the State of Illinois, and expended for the purpose of carrying on the work on the new State House, as contemplated by the said act, in pursuance of the terms of which said bond was so executed.

"And the plaintiffs further aver that afterwards, to-wit, on the 3d day of January, A. D. 1877, the said new State House, in the condition of said bond mentioned, was so far completed as to be ready for the use of the two houses of the General Assembly of the State of Illinois, and upon that day the General Assembly of said State convened therein for the first time, and occupied the same during its session held for that year.

"And the plaintiffs further aver that under and in pursuance of the provisions of the certain act of the General Assembly of the State of Illinois, entitled 'An act to secure to the State of Illinois four acres of additional grounds lying south of and adjoining the new capitol grounds,' approved May 21, 1877, and in force July 1, 1877, the Secretary of State of the State, to-wit, on the 15th day of September, A. D. 1877, at the city of Springfield in said State, ascertained and indicated such additional grounds lying south of and

adjoining the new capitol grounds as the State requires for enlarging the capitol grounds, containing three acres and six hundred and forty-six thousandths (3.646) of an acre, situated in the city of Springfield, county of Sangamon, and State of Illinois, and bounded as follows :

[Here follows description of the land, the same as that given in the Commissioners' report, hereinafter set forth.]

"And the said additional State House grounds so ascertained and indicated by the said Secretary of State, does not exceed four (4) acres, nor is the same less than the quantity of land described in the certain bond filed with the Secretary of State at the session of the 27th General Assembly next preceding the passage of said act approved June 14, 1871, and in force July 1, 1871, and which bond is mentioned in the second section of said act as the bond dated April 4, 1871.

"And the plaintiffs further aver that, to-wit, on the day and year last aforesaid, and within sixty days after the said additional State House grounds had been so ascertained and indicated by him, the said Secretary of State made out and caused to be published, delivered to and served upon each of the said defendants, the obligors in said bond, a demand bearing date September 15, 1877, containing and setting forth an accurate description of the said lands so ascertained and required, and also containing a notification to, and a demand of, said defendants and obligors to procure and furnish to the State of Illinois, free of cost to said State, within four months after said demand, the said lands so ascertained and indicated, and in said demand in writing described, as required by the statute in that behalf, that is to say, the said Secretary of State caused said demand to be delivered to each and every of said obligors who were then residents of the State of Illinois, except to such resident obligors who were absent from their usual place of abode, and for such obligors he caused a duplicate copy of said demand to be left at their usual places of abode, respectively, with a member of their respective families, above the age of ten years, for each of them, and as to such

of said obligors as were then non-residents of the State, the said Secretary of State caused said demand to be published in the *Illinois State Journal*, a public newspaper published in the city of Springfield, county of Sangamon, and State of Illinois, once each week for three successive weeks, the first publication being on September 17, 1877, and the last publication of said demand being on the first day of October, 1877; and the said Secretary of State did also, within ten days after the first publication of said demand, send a copy thereof, by mail, addressed to each of said non-resident obligors whose postoffice was known to said Secretary of State.

"And the plaintiffs further aver that the period of four months after such demand had been so made in conformity to the provisions of said last mentioned act having elapsed, and the defendants and obligors in said bond not having procured or caused to be obtained for the use of the State of Illinois the grounds so ascertained, or any part thereof, free of cost to the State, but having wholly failed so to do, the Governor of the State of Illinois, on the application of the Attorney General of said State, in pursuance of the provisions of said last mentioned act, to-wit, on the 11th day of March, A. D. 1878, did appoint three reputable and disinterested free holders, citizens of the State of Illinois, viz: Charles Hitchcock, Joseph G. English and Orlin H. Miner, commissioners to condemn said grounds for the use of the State, and to ascertain and report the compensation to be made to the owner or owners of said grounds therefor, and for such damages as might be occasioned by the condemnation and taking of said grounds by the State to other lands of the said owners adjoining thereto. And the plaintiffs further aver that said commissioners so appointed, afterwards, to-wit, on the second day of April, A. D. 1878, convened at the city of Springfield, in said county, and organized as such commission, and thereupon took the oath prescribed in section 8 of the act entitled 'An act to provide for the exercise of the right of eminent

domain,' approved April 10, 1872, as required by the act under which they were so appointed.

"And the said commissioners then and there adopted certain resolutions of the tenor and effect following:

" '1.  *Resolved,* That the commissioners will meet on Tuesday, the 28th day of May, 1878, at the State House in the city of Springfield, to condemn the ground ascertained and · indicated by the Secretary of State, under the act of May 21, 1877, and to transact such other business as may come before them.

" '2.  *Resolved,* Further, that personal notice of the time and place of such meeting be given to the owners of said ground so far as they may be found within the State, at least forty days before said 28th of May, and that notice thereof be also given by publication three times in the *Illinois Daily State Journal* and the *Illinois Daily State Register,* at least forty days before such meeting.

" '3.  *Resolved,* Further, that a copy of said notice be sent by mail to any owner or owners whose address outside of the State may be known.'

"And in pursuance of said resolutions the said commissioners prepared and signed notices of the tenor and effect following, to be served upon the owners of said land sought to be condemned, to-wit:

" 'To Ninian W. Edwards, John Prather, Christopher C. Brown, trustee of Julia C. Baker, and whom it may concern:

" 'Take notice that the undersigned commissioners, appointed by the Governor of the State of Illinois, under an act of the General Assembly approved May 21, 1877, to condemn certain grounds heretofore ascertained and indicated by the Secretary of State for the use of the State for additional State House grounds, and to ascertain and report the compensation to be made to the owner or owners thereof, and such damages as may be occasioned by the condemnation and taking of said grounds to other lands of said owners adjoin- ing thereto, will meet at the State House in Springfield,

Illinois, on the 28th day of May, A. D. 1878, at 10 o'clock
A. M., to inquire and determine such compensation and dam-
ages, at which time and place you can be heard in person or
by counsel, and can present such testimony pertinent to the
inquiry as you may desire.    The ground ascertained and
indicated by the Secretary of State under said act of May 21,
1877, is embraced in the lots, pieces and parcels of ground
located in the city of Springfield, State of Illinois, included
in and bounded by lines as follows, viz : '

(Here follows description of each tract corresponding with
the description given in the commissioners' report.)

"And that said commissioners caused the said notice to be
served upon Ninian W. Edwards, Christopher C. Brown,
trustee of Julia C. Baker, William Jayne, who was then and
there the mayor of the said city of Springfield, and John H.
Johnson, tenant in possession of the portion of the premises
owned by Christopher C. Brown as trustee for Julia C. Baker,
by delivering to each of them a copy thereof on the 4th day of
April, 1878 ; and also caused said notice to be served upon
said John Prather, by the delivery of a copy thereof to him
on the 11th day of April, 1878, and also caused notices of like
tenor and effect to be published in the *Illinois State Journal*,
and also in the *State Register*, on the fourth, fifth and sixth
days of April, 1878, the said *Illinois State Journal* and *State
Register* each then and there being a daily newspaper, pub-
lished in the city of Springfield, in said Sangamon county;
and that said commissioners, on the 4th day of April, 1878,
caused copies of said notices to be sent by mail to Edward
L. Baker and Julia C. Baker, his wife, at Buenos Ayres,
South America, where the said Edward L. Baker and Julia
C. Baker then resided; and that the said parties upon whom
the said notices were so served, were then and there the owners
of said land so indicated as such additional State House
grounds.    And that said commissioners having adjourned to
meet on the 28th day of May, A. D. 1878, again convened
on that day, in pursuance of such adjournment, at the time

and place specified in said notice, and adjourned until May 29, 1878, and the said Ninian W. Edwards then and there appeared before the said commissioners in person, and the said John Prather also appeared by James W. Patton, his attorney, and each of the said parties so appearing participated in the said investigation before said commissioners, by the examination and cross-examination of witnesses pertaining to the subject of the inquiry so before the said commissioners, in respect to the condemnation of said lands. And that such proceedings were thereupon had by the said commissioners that afterwards, to-wit, on the 30th day of May, 1878, they made and concluded their condemnation of said additional grounds, in the manner stated in the report of the proceedings of said commissioners in that behalf, made by said commissioners in writing, and which said report was subscribed and filed by said commissioners in the office of the Secretary of State of the State of Illinois, on the 30th day of May, 1878, and is of the tenor and effect following, to-wit:

" ' STATE OF ILLINOIS, *Springfield, May* 30, 1878.
" ' *To his Excellency, Shelby M. Cullom, Governor:*

" ' The undersigned commissioners appointed to condemn certain grounds heretofore ascertained and indicated by the Secretary of State, and to ascertain and report the compensation to be made to the owner or owners of said grounds, and for such damages as may be occasioned by the condemnation and taking of said grounds by the State, to other lands of said owners adjoining thereto, respectfully report : That they have ascertained the amount of the compensation to be made to the owner or owners of said lands respectively, and the damages occasioned by the condemnation and taking of said grounds by the State to other lands of said owners adjoining thereto. They have ascertained the compensation to be made for the following described premises, to-wit, commencing at the south-east corner of the State House grounds, running southward on the west line of Second street forty (40) feet,

thence westward six hundred and nineteen and forty one-hundredths (619.40) feet, to the east line of Spring street, thence northward forty (40) feet to the south-west corner of the State House grounds, thence eastward six hundred and nineteen and twenty-eight one-hundreths (619.28) feet to the place of beginning, and fixed the same at sixteen hundred ($1600) dollars. They have ascertained the compensation to be made for the following described premises, to-wit, commencing at a point forty (40) feet south of the south-east corner of the State House grounds and on the west line of Second street, thence running southward one hundred and twenty-three (123) feet, thence westward four hundred and fifty-nine and sixty-eight one-hundredths (459.68) feet to the east line produced of John Prather's lot, thence northward one hundred and twenty-three (123) feet to the south line of Charles street, thence eastward four hundred and fifty-nine and forty one-hundredths (459.40) feet to place of beginning, and fixed the same at ten thousand, five hundred dollars ($10,500.) They have ascertained the compensation to be made for the following described premises, to-wit, commencing at a point one hundred and sixty-three (163) feet south of the south-east corner of the State House grounds, and on the west line of Second street, thence running southward ninety-one (91) feet to the south side of Jackson street produced from Spring street to Second street, in Edwards & Mather's addition to the city of Springfield, thence westward six hundred and eighteen and seventy-seven one-hundredths (618.77) feet to the east line of Spring street, thence northward one hundred and nine and fifty one-hundredths (109.50) feet to the land of John Prather, thence eastward along the south line of John Prather's land one hundred and sixty (160) feet to the land of Christopher C. Brown as trustee of Julia C. Baker, thence southward thirteen (13) feet, thence eastward four hundred and fifty-nine and sixty-eight one-hundredths (459.68) feet to place of beginning, and fixed the same at twelve thousand

five hundred dollars ($12,500,) and as compensation for damages to other lands adjoining thereto, belonging to the same owner, fifteen hundred dollars ($1500.) And they have ascertained the compensation to be made for the following described premises, to-wit, commencing at a point forty (40) feet south of the south-west corner of the State House grounds on the east line of Spring street, thence running southward one hundred and ten (110) feet, thence eastward one hundred and sixty (160) feet, thence northward one hundred and ten (110) feet to the south line of Charles street, thence westward one hundred and sixty (160) feet to the place of beginning, and fixed the same at eight thousand ($8,000) dollars.

' In testimony hereof, we have hereto subscribed our names.

CHARLES HITCHCOCK,<br>
JOSEPH G. ENGLISH,<br>
ORLIN H. MINER,<br>
Commissioners.'

"And for assigning a breach of said condition of said writing obligatory, the plaintiffs further say that although the period of thirty days after the said report of said condemnation, so made by said commissioners, was so filed in the office of the Secretary of State had long since elapsed and fully expired before the commencement of this suit, yet the said defendants have not, nor have either or any of them, or any of the obligors to said bond, paid to the Treasurer of the State of Illinois, the total sum so reported by said commissioners, as compensation for the lands so condemned and taken or damaged, together with the costs and charges of said condemnation, nor have they paid any or either of said sums in said report specified, nor any part thereof, but to pay the same or any part thereof, to the Treasurer of the State of Illinois said defendants and obligors to said bond have hitherto wholly neglected and refused, and still do neglect and refuse, to-wit, at the place aforesaid. By means whereof

an action hath accrued to the plaintiffs, The People of the State of Illinois, to demand, have and receive of and from said.defendants said sum of five hundred thousand dollars above demanded. Yet the said defendants have not paid the same to said plaintiffs, or any part thereof, but neglect and refuse so to do, to the damage of the plaintiffs in the sum of fifty thousand dollars, and therefore the plaintiffs bring suit."

. To this declaration some of the defendants demurred; others filed special pleas, and the residue failing to answer altogether, defaults were regularly entered against them. An issue of fact was joined upon one of the special pleas; demurrers filed as to others, and replications as to the residue. Issues of fact were joined upon some of these replications, and demurrers interposed as to the others.

The cause was submitted to the court upon the several demurrers to the declaration, pleas, and replications, on the 9th of December, 1878, and after argument of counsel, the court not being fully advised, took time to consider until the 19th of the same month, when, upon due consideration, the demurrer to the declaration was sustained by the court, and the plaintiffs electing to stand by their declaration, it was ordered and adjudged that the writ be dismissed, whereupon the plaintiff appealed to this court.

Mr. JAMES K. EDSALL, Attorney General, for the People.

Messrs. STUART, EDWARDS & BROWN, Messrs. ROBINSON, KNAPP & SHUTT, Messrs. HAY, GREENE & LITTLER, and Mr. N. W. EDWARDS, for the appellees.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

It will be perceived that the ultimate question to be determined by this court is, whether the declaration in the case discloses a cause of action against the defendants, or, in other words, whether the declaration is good on general demurrer.

The solution of this question, however, depends upon the answer that must be given to others which arise upon the record, and which are of more than ordinary importance.

Preliminary to the discussion of these questions it may be observed, in a general way, that the measure of the defendants' liability is to be found in the written contract into which they have entered. If its terms are plain and unambiguous, and it is otherwise unexceptionable, this court must enforce it as the parties have made it, notwithstanding apparent hardships may result from such enforcement. It must not, under the guise of construction, be expanded on the one hand, to cover a case which the parties to it have not provided for, nor on the other hand, be so contracted as to relieve the parties from liabilities or duties they have expressly, or by necessary implication, undertaken to perform.

But if the terms of the contract are in any respect ambiguous or uncertain, it must be construed and enforced according to what may, in the light of all its provisions and the circumstances surrounding the transaction, be presumed to have been the intention of the parties to it.

It is further to be observed that in most contracts, whether verbal or written, by deed or parol, there are certain obligations and duties which arise by implication of law from the express stipulations of the parties, and their respective relations to each other with respect to the subject matter of the contract.

Keeping in view these well recognized principles, we pass now to the consideration of the contract upon which the mutual rights of the parties thereto must depend.

The contract of the defendants is in the alternative. By it they in substance agreed to either furnish the State, free of cost, the additional capitol grounds in question, or in case they were unable to do so, or refused to do so, to pay, in the event of a condemnation of the same by the State, the *amount assessed* for the same under the condemnation proceedings. The State was absolutely bound to do nothing.

It might or might not, on the defendants' failure to furnish the grounds in question, proceed to condemn the same, as in its wisdom seemed best. Such being the respective rights and duties of the parties, it would seem but just and reasonable to hold that, before any right of action could accrue upon the bond, the State was bound to institute, and prosecute to a successful termination, such condemnation proceedings as would, upon the payment of the condemnation money, vest the title to these grounds in the State, and for this purpose the State impliedly undertook to provide all such agencies, including appropriate legislation, as would be necessary to effectually accomplish the end proposed. The acquiring of the title to the grounds by the State, for State House purposes, was the sole inducement and consideration for the execution of the bond, and any construction of its provisions which would require the defendants to pay for the grounds before the State acquired title thereto would be manifestly unjust to them, and unwarranted by sound legal principles. The utmost that can reasonably be claimed is, that the vesting of the title in the State, and the payment of the condemnation money by the defendants, were intended by the parties to be concurrent acts; or, in other words, the State, in accepting this bond from the defendants, impliedly stipulated that, in the event of condemnation proceedings, it would so shape its legislation, and the proceedings under it, that the payment of the condemnation money and the acquiring of the title by the State would be concurrent acts. And if this be the true construction of the contract, it is hardly necessary to observe that it was altogether incompetent for the legislature to place a different construction upon it, so as to materially affect the rights of the defendants under it.

And this brings us to a consideration of the act of May 21, 1877, under which the alleged condemnation proceedings were had. The preamble recites the provisions of the act of June 14, 1871, under which the bond sued on was executed. The first section makes it the duty of the Secre-

tary of State to ascertain and indicate the additional grounds required, and give notice thereof to the obligors, and to demand of them their procurement for the State.

The second section provides for the appointment of commissioners and the condemnation of the grounds.

The third section requires the commissioners to make and file in the office of the Secretary of State a report in writing of their proceedings, and upon the filing thereof it is declared that the title to the lands shall vest in the State.

The fourth section is in these words: "Upon filing of said report in the office of said Secretary of State, he shall make out and file a certified copy thereof with the Auditor of Public Accounts of this State, who shall thereupon draw his warrant or warrants upon the Treasurer of this State in favor of the owner or owners of the lands so condemned; and said Treasurer shall, upon presentation by such owner or owners respectively of said warrants, pay to said owner or owners the amount or amounts so reported to be due him or them respectively, *out of any moneys in said treasury appropriated for State House purposes.*"

The fifth and last section makes it the duty of the Attorney General to institute suit upon the bond if the obligors do not, within thirty days after the filing of the commissioners' report, pay to the Treasurer of the State "the total sum so reported by said commissioners as compensation for the lands," etc.

The foregoing comprises the entire legislation under which the condemnation proceedings were conducted, and it will be perceived that the act, as framed, does not provide for or even contemplate a payment of "*the amount assessed*" under the condemnation proceedings, by the obligors. But on the contrary, the 4th section of the act expressly provides that the payment of the condemnation money shall be made by a warrant or warrants drawn by the Auditor on the Treasurer, to be paid out of any moneys in the treasury *appropriated for State House purposes.* This provision of the act is to be regarded as mandatory, and it by necessary implication

excludes any other mode of payment. The condemnation proceedings, including the mode of payment, could only be conducted and accomplished in the manner provided by law, and, as just stated, the owners of these lands were, by the express provisions of the act, to be paid out of moneys in the treasury *appropriated for State House purposes.*

The State is just as powerless as any other municipal corporation to act in a matter of this kind, unless the requisite authority has been conferred upon it by the legislature. When such authority has been given, and the manner of exercising it has been prescribed by the legislature, it is not competent for the State to exercise it in any other manner; and any attempt to do so would not be binding on any one. The act directed that the Auditor, upon the filing of the commissioners' report in his office, should at once draw his warrant or warrants upon the Treasurer in favor of the owners of these lands. This has never been done; at least the declaration contains no averment to that effect, and it must be presumed that it has not been done, otherwise it would have been so averred. The requirements of the act, then, have not been complied with in this very vital particular, and it may be regarded as a very serious question whether the owners of these lands, after this great lapse of time, could be compelled, under those proceedings, to accept payment, even if it could now be otherwise legally made. The land owners could only be compelled to accept payment in the manner provided by law. That was a cash payment by a warrant or warrants on the Treasurer. No such payment having ever been made or attempted to be made, we are unable to see upon what principle these proceedings can now be regarded as binding upon the owners of these lands. And if such is the case, it is equally difficult to understand upon what theory an action can be maintained upon the bond. It can not justly be claimed that the failure to pay the land owners was attributable to the default of the obligors, for the act of the legislature under which the condemnation proceedings were conducted did not

authorize them to make such payment. On the contrary they were directed to pay to the State Treasurer within thirty days —whereas the law required the land owners to be paid at once upon the filing of the commissioners' report. If at the expiration of the thirty days after the filing of such report the obligors found there had been no compliance with the act in this respect, were they not justified in concluding that the State had abandoned—as it undoubtedly had a right to—the matter altogether?

Moreover, if, as we have seen, the owners of these lands could only be paid out of moneys in the treasury appropriated for State House purposes, it follows that the moneys required to be paid to the Treasurer by the obligors, as contemplated by the fifth section of the act, can only be regarded as having been intended by the legislature as an indemnity or reimbursement for the moneys to be paid by the State on account of the condemnation of the lands.

And this view of the matter is greatly strengthened by the fact that the Auditor is required, *upon the filing* of the commissioners' report, to draw his warrant or warrants upon the Treasurer for the condemnation money. The act requires him, as we have just seen, to draw at the time of filing—that is, at once. Whereas the obligors have thirty days after the filing of the report within which to make payment to the Treasurer.

If, then, the money to be paid to the Treasurer by the obligors is only to be regarded as a mere indemnity for moneys advanced by the State under the condemnation proceedings, it is very clear that no action can be maintained on the bond without averring and proving an actual payment of the condemnation money by the State.

In the view here presented we must not be understood as intimating that the State may under any circumstances, or for any purpose, become the mere surety of, or that it may lend its credit to, any person or association of persons; for this is expressly inhibited by the constitution.

We have simply been considering the rights of the parties to this record, so far as they depend upon what seem to be the plain provisions of the statute in question, without at all considering the validity of any of its provisions.

In the view we have taken of this case it is deemed unnecessary to enter upon an inquiry of that kind.

It is manifest, if we are correct in the conclusions already reached, that the condemnation proceedings in question were commenced at a time and under such circumstances as must necessarily have rendered them ineffectual and fruitless without additional legislation.

As under the present constitution all appropriations by the General Assembly can only be made by public law, this court will take judicial notice of the fact that, at the time of the commencement of the condemnation proceedings, the General Assembly had already, by previous appropriations on account of the new capitol grounds and construction and furnishing of the State House, exhausted the constitutional limitation of $3,500,000, and of the further fact that there was no money then in the treasury that could be legally applied in payment of these lands, and any such payment would have been a palpable violation of the constitution. And not only so, but no future appropriation could be made for that purpose without an affirmative vote of the people. To hold, therefore, the defendants liable on the bond before requiring the State to obtain a title to the lands sought to be condemned, upon the hypothesis that at some future time the people of the State would vote the necessary appropriation, would be, judging from the temper of the people as shown by their vote on the question, compelling them to pay money out of their pockets without any consideration except a mere contingency that may never happen. To avoid this result, it is insisted by the learned counsel for appellants that the constitutional limitation above referred to has no application to the lands in question; that the expression "new capitol grounds," as used in the constitution, must be limited to such

grounds as the State had, at the time of the adoption of the constitution, already acquired for the purposes of the new capitol. We can not concur in this view. It is too narrow and contracted to accomplish the object that the framers of the constitution had in view when adopting that provision. The expression was doubtless intended to cover and include all grounds belonging to the capitol, without regard to when they were purchased.

But even conceding the legislature had power to appropriate the proceeds of the bond to the payment of these lands, it is clear that nothing of the kind was attempted by the act. By implication the act simply required the obligors to pay the amount of condemnation money to the Treasurer within thirty days from the filing of the commissioners' report, but the act is entirely silent as to what disposition was to be made of it when paid. It was clearly not intended that the treasurer should pay it to the owners of the condemned lands, for, as already shown, the act expressly provides for their payment in another way, namely : out of moneys in the treasury appropriated for State House purposes. It must, therefore, have been intended that the money, when paid to the Treasurer, should go into the general State fund, and, having once become a part of the general State fund, of course it could not be paid out except for some purpose authorized by law. And, inasmuch as the State had already by former appropriations exhausted the constitutional limitation for State House purposes, it could not be appropriated to the payment of these lands without an affirmative vote of the people, which, as already stated, might never happen.

As already observed, the measure of the defendants' liability is to be found in the bond itself, and it is not competent for the legislature to modify it in the slightest degree by subsequent legislation. The undertaking of the obligors was to pay the amount assessed under the condemnation proceedings. The statute is silent as to whom the payment was to be made. That is left to judicial construction. An omission

of this kind ordinarily presents no difficulty. If one agrees with another for a valuable consideration to pay a debt due from the latter to a third party, although the contract is entirely silent as to whom the payment shall be made, there could be no question but that the payment should be made to such third party. Indeed, it may be stated generally that an undertaking to pay a claim of any kind without mentioning the party to whom the payment is to be made, is in law an undertaking to pay the owner of such claim. The contract of the defendants here was to pay the amount of the assessment under the condemnation proceedings, or, in short, to pay the condemnation money. Now, while the contract is silent as to whom the payment was to be made, it is quite evident that the owners of the condemned lands would be entitled to the condemnation money when paid, and, according to the general rule of law just stated, the defendants impliedly undertook and agreed to pay the owners of the condemned lands according to their respective interests, and such we hold to be the true construction of their contract.

This, then, being the contract of the defendants, the State, in accepting it, thereby impliedly agreed, in the event of instituting condemnation proceedings, to provide such appropriate and necessary legislation for that purpose as would authorize and require the defendants, as a part of the condemnation proceedings, to make such payment, and generally to so shape its legislation and conduct the proceedings that the State, upon such payment, would acquire a good title to the lands in question. The legislation provided for this purpose was not, as we have already shown, adapted to this end. Under it the agreement between the State and the defendants could not be lawfully executed so as to effectuate the objects of the contract. This being so, the defendants were not, by reason of anything done under the act in question, placed in default, and until that is done by appropriate legislation and proper proceedings thereunder, no action can be maintained upon the bond.

10—97 ILL.

This view of the case renders it unnecessary to consider a number of questions that have been discussed by counsel on either side with great learning and ability.

The judgment of the court below is affirmed.

*Judgment affirmed.*

SCOTT and SHELDON, JJ.:    We do not concur in this opinion.

DICKEY, Ch. J.:  One reason not stated in the foregoing opinion, which leads me to concur in this decision and adopt the conclusion reached in this case, is that there has not been a condemnation of the premises of such character as to make it the duty of the obligors in this bond to pay the amount. The constitution requires that in all condemnation proceedings, except in cases where the compensation is to be paid by the State, the assessment of the amount shall be by jury. In this case the provision for paying out of the funds of the State was void; for, under the facts and the constitution, the legislature had no authority to so enact.  The provision being void, it follows that the compensation was to be paid (if at all) by these obligors.  They are not the State.  The State had no interest in the question of the amount of compensation.  The owners of the land and these obligors *alone* were interested in that question.  They had in such case a right to have the amount determined *by jury*.  That right is given to the party making compensation, as well as to the land owner. Until the amount was determined in a manner effective under our constitution, these obligors were not bound by this bond to pay.

WALKER, J.:  I concur in the conclusion in this case.  I hold the damages should have been assessed by a jury, as it only involves private interests.  I also hold the obligors were not liable until the State had assented to and bound itself to receive the property, and pay the money, when collected, to the owners.